471 P.2d 726

Frank I. JERGER and Bertha Jerger, his wife, Appellants,

v.

Morris J. RUBIN and Sari J. Rubin, his wife, Appellees.

Ed THIRKHILL, Ed Thirkhill Realty, Cross-Appellants,

v.

Frank I. JERGER and Bertha Jerger, his wife, Cross-Appellees.

No. 9974–PR.

Supreme Court of Arizona, In Banc.

July 3, 1970.

Rehearing Denied Sept. 15, 1970.

Sullivan & Mahoney, by William P. Mahoney, Jr., Phoenix, for appellants.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, by Wilbert G. Anderson, Phoenix, for appellees.

Milliken & Mitchell, by James T. Milliken, Scottsdale, Moeller, Hover, Jensen & Henry, by James Moeller, Phoenix, for cross-appellants.

LOCKWOOD, Chief Justice:

This is an appeal, by the sellers of a parcel of land, from a judgment of the Superior Court rescinding the contract of sale. The Court of Appeals, Division 1, Department B, reversed the judgment of the Superior Court, and this Court granted review. The opinion of the Court of Appeals, 11 Ariz.App. 183, 463 P.2d 78 (1969), is vacated and the judgment of the Superior Court is affirmed.

The facts show that in 1964 the defendant-sellers, Frank I. Jerger and his wife, were the owners of a five acre parcel of land located on North Scottsdale Road and Shea Boulevard in Scottsdale, Arizona. The property was zoned commercial. On June 1, 1964, the Jergers sold the entire parcel to the plaintiffs, Morris J. Rubin and his wife. The sale was negotiated by cross-appellant-defendant, Ed Thirkhill realty, through its salesman, R. L. Stamper. Stamper was a defendant at the trial, but is not a party to this appeal.

In February 1964, defendant Stamper contacted the plaintiffs and advised them that he had an unusually attractive real estate deal consisting of a five acre commercial parcel. The price of the property was $125,000. The deal was particularly attractive because, according to plaintiffs' testimony, Stamper told them that Shell Oil Company "had agreed" to purchase a corner portion of this property for $75,000 and that the Shell Oil deal would be closed "back-to-back" with plaintiffs' purchase of the entire parcel. Stamper further advised plaintiffs that the sellers could not take advantage of the Shell deal because they had to sell the parcel as a five acre unit to avoid adverse tax consequences.

Following these representations, plaintiffs agreed to purchase the property. The purchase contract, which took the form of a trust agreement, required a down payment of $36,250 and the balance in four annual payments with the first annual principal and interest payment due June 2, 1965.

After the transaction was closed, plaintiffs inquired of Stamper on several occasions as to the progress being made on the purchase by Shell Oil. Stamper informed them that he felt he could obtain

an additional $10,000 over and above the original deal and, therefore, had not closed the deal. The additional $10,000 did not materialize, and in January or February of 1965 plaintiffs advised Stamper to accept the original $75,000 purchase price. At this time, Stamper told plaintiffs that Shell had decided not to purchase the site because of a Scottsdale sign ordinance then in effect. However, he informed plaintiffs that he had contacted another party (Ray A. Brashear) who was willing to purchase the site for $65,000. Based on this representation, plaintiffs authorized Stamper to set up an escrow for the sale of the site. This escrow was established on March 4, 1965.

Brashear testified that he told Stamper that he was only interested in the service station site if it had a firm lease on it. He also testified that prior to the trial, he had never seen the escrow instruments Stamper prepared for the site.

In April 1965 Stamper again contacted plaintiffs and advised them that because of domestic problems, Brashear would be unable to purchase the site. He related, however, that he had an additional purchaser for the service station property (the Rothchilds) who would purchase the site for the same price.

Pursuant to this last representation, plaintiffs and the Rothchilds both signed escrow instructions agreeing to the sale of the site for $65,000. This sale, however, was expressly contingent upon a lease being secured with American Oil Company, which Stamper represented would be forthcoming.

While the Rothchild escrow was pending, plaintiffs contacted defendant sellers, asking for an extension of time to make the initial annual payment due on June 2, 1965. Although hesitant at first, defendant sellers agreed to an extension on the principal payment, provided that the interest payment was made on time.

On May 16, 1965, plaintiffs contacted another real estate agent, and from that contact requested defendant Stamper to show them his files concerning the property. A search of Stamper's files revealed that there had been no negotiations with Shell Oil Company, or with any other oil company, concerning either a sale or lease of this property. At the trial this was verified by representatives of American Oil Company and Shell Oil Company who testified that their respective companies had no files that would reflect any dealing on the parcel of land in question.

Plaintiffs failed to make the interest payment on June 2nd, and on June 25, 1965, defendant sellers issued a notice of forfeiture against plaintiffs. On July 13, 1965, plaintiffs offered to rescind the transaction because of the alleged fraud of defendant Stamper. This offer was rejected, the property was forfeited back to defendant sellers, and this suit for rescission by plaintiffs followed.

The trial court sitting without a jury found for plaintiffs and granted rescission. Since the forfeiture of plaintiffs' interest had already occurred, the trial court granted judgment against defendant sellers for the down payment price, granted judgment for defendant sellers against the defendant Thirkhill for the amount of commission paid, and for defendant sellers and against defendant Stamper for the balance of the down payment. Further, defendant Thirkhill was granted judgment against defendant Stamper for the amount of commission paid him.

Defendant sellers appeal from the judgment granting rescission and the money judgment against them, and defendant Thirkhill appeals from that portion of the judgment entered in favor of defendant sellers against it. Defendant Stamper did not appeal the judgment against him.

■ The trial court was not requested to, and did not make findings of fact or conclusions of law. Accordingly, this Court must view the evidence and reasonable inferences therefrom in the light most favorable to plaintiffs and if there is any evidence to support the judgment it must be affirmed. Balon v. Hotel & Restaurant Supplies, 103 Ariz. 474, 445 P.2d 833 (1968).

Defendants' first contention is that Stamper's alleged representations were not actionable as a basis of rescission because they did not relate to a present fact. Defendants argue that the representations as to the Shell Oil deal were either merely "puffing" statements or were statements of a future probability or expectation. This contention, however, misses the thrust of plaintiffs' allegations and the evidence as developed at the trial.

The evidence adduced at trial shows that when Stamper first approached plaintiffs, he represented that he had negotiated with Shell Oil and that they "had agreed" to purchase the service station site and that this sale would be closed "back-to-back" with the purchase from defendant sellers. It is true that the Shell Oil deal was to be closed after the sale between plaintiffs and defendants. The falsity of the representation that the deal would be closed "back-to-back" is not what plaintiffs have relied upon to support their cause of action. The representation relied upon was the fact that Stamper had contacted and been in negotiations with Shell. The evidence clearly showed that he had not. Cf. Miller v. Boeger, 1 Ariz.App. 554, 405 P.2d 573 (1965).

Defendants' second contention is that plaintiffs, by laches, waiver and estoppel, lost any right they may have had to relief by rescission or damages.

The defense of laches, waiver and estoppel, are all affirmative defenses. Ariz.R.Civ.P., Rule 8(d), 16 A.R.S. As such, it is the defendant's duty to plead and prove each.

The defense of laches, estoppel, and waiver raise similar questions of law and fact and can be discussed together for the purpose of this appeal. Laches, a form of estoppel, is a defense where, because of delay or by lapse of time, the party asserting the defense either is injured (by the mere lapse of time) or changes his position in reliance on the other party's inaction. Jones v. McNabb, 184 Okl. 9, 84 P.2d 429 (1938). Additionally, the delay must come after the party against whom the defense is asserted becomes aware of or has knowledge of, his right. Greeley & Loveland Irr. Co. v. McCloughan, 140 Colo. 173, 342 P.2d 1045 (1959).

Defendants contend plaintiffs lost their right to rescind the contract, or recover money damages by exercising control over the property after they discovered that the original Shell Oil deal would not be consummated. The following excerpt from the case of Mackey v. Philzona Petroleum Co., 93 Ariz. 87, 378 P.2d 906 (1963) is cited in support of this argument:

"* * * the power of avoidance for fraud or misrepresentation is lost if the injured party after having acquired knowledge, actual or constructive, of the fraud, manifests to the other party an intention to affirm or exercise domination of things, restoration of which is a condition of his power of avoidance." 93 Ariz. at 91, 378 P.2d at 908.

The Mackey case, however, is not controlling in the case at hand. There, the plaintiff Mackey was attempting to rescind a contract in which the consideration was a transfer of stock to the plaintiff. However, after the right to rescind arose he made assignments of the stock to third parties. By making these assignments, he lost his right to rescind in two ways. First, by assigning the stock, he placed himself in a position where he could not return the stock to the defendant. When a contract is rescinded, the court must be able to place the parties in the status quo. Second, in making the stock assignments, Mackey was doing an act in affirmation of the agreement he was trying to rescind. And, this act was done after he had knowledge of the event giving rise to the rescission occurred.

The instant case is not the same. Plaintiffs did not discover Stamper's misrepresentation (the fact that he had never negotiated with Shell) until *after* the negotiations with Brashear and the Rothchilds. Additionally, no conveyance of any part of the property was ever consummated by

plaintiffs and, therefore, they were in a position to return the parties to the status quo.

■ Defendant sellers have an additional contention that is not concurred in by defendant Thirkhill. This contention is that since defendant Stamper was only given authority to sell on specific, announced terms, Stamper was not defendant seller's agent for purposes of the misrepresentations.

The law, in this regard, has been well settled in Arizona for some time now. In 1928 this Court first held that:

"* * * a real estate broker who is not authorized to convey land, but who merely may find a purchaser upon the terms fixed by his principal, cannot bind the principal by representations * * * unless he was expressly authorized to make such representations, or unless they are known to his principal before the sale is consummated." Light v. Chandler Improvement Co., 33 Ariz. 101, 107, 261 P. 969, 971 (1928).

In support of this holding, Justice Alfred C. Lockwood reasoned as follows:

"If we are to hold the owner of property bound by any and all representations made by any one of a dozen brokers under such circumstances, and liable in an action for fraud and deceit because of such representations, when they are entirely unknown to him and would have been indignantly repudiated, had they been called to his attention, the door to fraud upon the owner will be thrown wide open." Light v. Chandler Improvement Co., 33 Ariz. at 108, 261 P. at 971.

Although the above clearly outlines the general rule in broker negotiated land sales, the law does not leave the purchaser without a remedy.

"When he [the purchaser] discovers the fraud, he has two courses open to him. He may either ratify the transaction so far as the owner is concerned and make the payments, notwithstanding the false representations, reserving the right to sue the agent in damages for such fraud and deception, or he may go to the owner and, stating the fraud, offer to rescind. If the owner, after due notice of the fraud and offer of rescission, insists upon holding the purchaser to his bargain, he will then be deemed to have ratified the alleged representations of the agent and the purchaser may pursue as against such owner any remedy which he would have had, had the false representations been made by the owner in person." Light v. Chandler Improvement Co., 33 Ariz. at 108–109, 261 P. at 971.

This general rule is also adopted by the Restatement (Second) of Agency.

The Restatement, however, notes an exception upon which defendant sellers rely. That is, the retention of the contract by the principal (seller) must be "before he has changed his position." Restatement (Second), Agency § 99. Defendant sellers argue that the extension of time for making the principal payment they granted plaintiffs is a sufficient "change of position" to bring the instant case within this exception. A close study of the record discloses, however, that plaintiffs' request for the extension came before they discovered Stamper's fraud and, therefore, the exception does not apply.

The instant case falls clearly within the general rule. When plaintiffs became aware of the falsity of Stamper's representations, they went to their attorney. On their behalf he wrote defendant sellers setting out, with particularity, the alleged false representations made by Stamper, and offering to rescind the contract. When defendants rejected this offer, they are deemed to have ratified their agent's representations and become bound by them. Light v. Chandler Improvement Co., supra.

Defendant, cross-appellant, Thirkhill raises one last point. This contention is that the alleged representations were not within the scope of Stamper's employment as a salesman for Thirkhill and, therefore, on agency principles, Thirkhill cannot be held liable for Stamper's representations.

Such a contention is without merit. To so hold would produce a ludicrous result.

 The salesman is employed by the broker to sell property. Within the scope of his employment the salesman is authorized to make representations concerning property he has been commissioned to sell. The principal is subject to liability for such authorized representations if they later prove to be false. Restatement (Second) of Agency, § 257. The authorization may be either actual or apparent. A representation is apparently authorized if the third party to a transaction reasonably believes from conduct for which the principal is responsible that the agent is authorized to make the representations as made. Restatement (Second) of Agency, § 257, comment a. The representations made by Stamper in the instant case fall at least within his apparent authority from Thirkhill and Thirkhill is bound by them.

The opinion of the Court of Appeals is vacated and the judgment of the Superior Court is affirmed.

STRUCKMEYER, V. C. J., and UDALL, McFARLAND and HAYS, JJ., concur.